# United States Court of Appeals
## For the First Circuit

03-2586

IN RE NTA, LLC, AND NTA II, LLC, Debtors

NTA, LLC, AND NTA II, LLC,

Appellants,

v.

CONCOURSE HOLDING COMPANY, LLC,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Torruella, Lynch, and Lipez, Circuit Judges.

Charles R. Bennett, Jr., with whom Harold B. Murphy and Jesse I. Redlener were on brief, for appellants.

Sabin Willett, with whom Julia Frost-Davies, Melissa G. Liazos, and Gregory N. Kazarian were on brief, for appellee.

August 17, 2004

**LIPEZ, <u>Circuit Judge</u>.**  Appellants NTA and NTA II placed their primary assets, the Membership Interests in a company, into an escrow account as part of an agreement to avoid foreclosure by a lender, appellee Concourse Holding Company.  Appellants subsequently filed for bankruptcy under Chapter 11.  They now claim that the Membership Interests placed in escrow are part of the bankruptcy estate and not the property of the appellee.  Both the bankruptcy court and the district court ruled that the escrowed assets were not part of the bankruptcy estate and were properly distributed from escrow to the appellee.  Interpreting the written agreements that govern the relationship between the parties, and applying both 11 U.S.C. § 541 and Illinois state law, we affirm.

## I.

We glean the facts from the record before the bankruptcy and district courts.  While there is a long and complicated history between the parties, we relate only those facts relevant to the issues on appeal.

NTA and NTA II (collectively, NTA) are holding companies. NTA owned one hundred percent of the Membership Interests[1] in Concourse Communications (Concourse), a company that develops, implements, and maintains wireless communication systems in airports and other public venues.  The Membership Interests were

---

[1]The Membership Interests represent the rights to equity ownership in Concourse.  They are the only ownership interests in Concourse.

NTA's primary assets and entitled NTA to exercise total control over Concourse. Based on its business contracts at the time of the bankruptcy filing, Concourse had a value in excess of $20 million.

In August of 1999, Concourse borrowed approximately $14 million to finance its business. On August 15, 2002, Concourse Holding Company (Holding Company) bought the rights to that loan from Concourse's original lender.[2] Concurrently with that purchase, Holding Company entered into an agreement with Concourse and NTA, providing that (1) Holding Company would provide up to $4.1 million in additional financing to Concourse, and (2) Holding Company would have the option to purchase NTA's Membership Interests in Concourse. In a separate agreement, executed simultaneously, NTA guaranteed Holding Company's loans to Concourse, offering its Membership Interests in Concourse as security. Under the terms of that agreement, if Concourse defaulted on its obligations to Holding Company, NTA would transfer its Membership Interests in Concourse to Holding Company.

In December 2002, Holding Company sent a notice of default to Concourse, stating that Concourse had failed to make its most recent scheduled interest payment. Concourse commenced a civil action in Illinois state court seeking a determination that

---

[2]Holding Company was created by Cardinal Growth, a venture capital fund, for the purpose of acquiring the loans to Concourse. Prior to acquiring those loans, Holding Company had no affiliation with Concourse.

it was not in default under the terms of its loan agreement with Holding Company.  In March of 2003, the parties suspended litigation and entered into two agreements, the Standstill Agreement and the Escrow Agreement.[3]

The Standstill Agreement was "intended by the parties to provide the terms under which the indebtedness of Concourse owed to, or held by Holding Company will either be paid off, or alternatively, the business of Concourse and its related entities transferred to Holding Company in satisfaction of the outstanding indebtedness."  Under the Standstill Agreement, Concourse had two options: it could either (1) pay off its loan obligations to Holding Company by April 30, 2003, or (2) obtain financing from another lender and provide Holding Company with a Letter of Intent from that lender by April 30, 2003, agreeing to pay off Concourse's loan obligations to Holding Company.  In the latter case, the new financing would have to have been completed by June 30, 2003.[4]

The Standstill Agreement also required NTA and Holding Company to place several documents in escrow.  First, it required both parties to submit a mutual release of liabilities.  These

---

[3]Although these agreements suspended litigation, they did not resolve the question of whether Concourse was in default. Concourse still maintains that it was not in default under the loan agreement.

[4]The Standstill Agreement provided that Concourse could extend the period for completing the new financing until July 31, 2003, if it requested an extension by June 15, 2003, and paid $100,000 to Holding Company.  Concourse never exercised this provision.

mutual releases were to be distributed to the parties if Concourse satisfied its obligations to Holding Company in accordance with the Standstill Agreement. Second, the Standstill Agreement required NTA and Concourse to submit a "Confession of Judgment," conceding that NTA and Concourse were liable to Holding Company for $13 million, to be released if Concourse failed to meet its obligations under the Standstill Agreement.

Finally, and most importantly for the issues on appeal, the Standstill Agreement required NTA to submit an "Assignment of Interests" that was "intended to transfer all right, title and interest in Concourse to Holding Company." This provision effectively required NTA to place its Membership Interests into escrow.[5] Paragraph 7 of the Standstill Agreement governed the release of the Membership Interests. Under its terms, the Escrow Agent would release the Interests to Holding Company if one of several "triggering events" occurred. The "triggering events" relevant in this case were (1) the failure of NTA to supply a Letter of Intent to Holding Company by April 30, 2003, and (2) the failure to close on new financing by June 30, 2003.

The Escrow Agreement specified the procedure for releasing the Membership Interests to Holding Company: the Interests should be released "upon the earlier of (i) two (2)

---

[5]Because the "Assignment of Interests" operated to transfer title in the Membership Interests, we characterize the property held in escrow as the "Membership Interests."

business days after the Escrow Agent receives a copy of the written notice from Holding Company to [Concourse] that a triggering event has occurred within the meaning of paragraph 7 of the Standstill Agreement, (ii) or July 31, 2003."[6] Despite the provision requiring the Escrow Agent to wait two business days before disbursing the Membership Interests, neither the Standstill Agreement nor the Escrow Agreement included any provision allowing NTA to prevent the distribution of the Membership Interests to Holding Company on any basis.[7]

On Friday, May 16, 2003, Holding Company sent a letter to the Escrow Agent giving notice of a "triggering event," namely that Concourse had not provided Holding Company with a Letter of Intent

---

[6]The Standstill Agreement contained a similar provision, requiring the Escrow Agent to release the escrowed documents after receiving written notice from Holding Company that a triggering event had occurred, "provided, however, that the Escrow Agent may not disburse without waiting 48 hours after written notice to Concourse that it has been notified by Holding Company that one of the triggering events has occurred."

[7]Appellees argue that the sole purpose of the two business day waiting period was to allow NTA to seek an injunction in Illinois state court if it thought that Holding Company had improperly notified the Escrow Agent of a triggering event. As discussed infra, appellants sought such an injunction in Illinois state court. Their pleadings to that court stated that "[t]he purpose of the [two business day waiting period] was to permit Concourse to appear before [the state court] to obtain injunctive relief against disbursement." Nevertheless, appellants argue on appeal that, because there was no express purpose stated in the Standstill Agreement for the two business day waiting period, we should not assume that it was only intended to give appellants time to seek an injunction. As our decision does not rely on the purpose of the two business day waiting period, we do not decide whether that provision was available only to seek an injunction.

from another lender by April 30, 2003, in compliance with the Standstill Agreement.[8] On Monday, May 19, 2003, NTA sought a temporary restraining order in Illinois state court to prevent release of the escrowed documents. The Illinois court denied NTA's motion, stating that NTA had "failed to present a fair question regarding [its] likelihood of success on the merits."

Several hours later, but before the expiration of the two business days that the Escrow Agent was required to wait before releasing the Membership Interests, NTA filed for Chapter 11 protection in U.S. Bankruptcy Court and claimed that the Membership Interests were part of the bankruptcy estate. Holding Company moved for relief from the automatic stay in order to receive the Membership Interests from the Escrow Agent. After hearing arguments, the bankruptcy court ruled that Holding Company's motion was moot because the Membership Interests were not part of the bankruptcy estate. In its bench ruling, the bankruptcy court reasoned that "[t]he escrow arrangement says that the membership interests would be transferred to Holding Company upon the delivery of the notice of default, or within two days thereafter. In light of the escrow agreement, the membership interests are no longer

---

[8]Concourse had provided a Letter of Intent on April 29, 2003. Holding Company contended that the letter did not meet the requirements of the Standstill Agreement. On May 7, 2003, Holding Company challenged the sufficiency of the letter in Illinois state court. On May 14, 2003, however, the letter was withdrawn by its issuer, making the court proceedings moot.

property of the bankruptcy debtors." The bankruptcy court issued an order to this effect on June 4, 2003, and the Escrow Agent released the Membership Interests to Holding Company on the following day.[9]

NTA appealed the June 4 order to the district court. On July 8, 2003, before the district court could hear the appeal, NTA filed a motion in bankruptcy court seeking to confirm that it held "redemption rights" in the Membership Interests. The bankruptcy court ruled that it had no jurisdiction to consider the motion because the June 4 order was on appeal to the district court. NTA appealed this second order to the district court.

The district court consolidated the two appeals. On November 12, 2003, the district court held that NTA's bankruptcy estate had no rights to the Membership Interests, and that it did not retain any right of redemption in those interests. The court's order stated that "the membership interests in question left the possession of [NTA] at the time they were transferred to the Escrow Agent," and that "[a]t the latest, [NTA's] claim to [the] membership interests (including any right of redemption) was extinguished at the time of the triggering event."

NTA now appeals the ruling of the district court, arguing that (1) the Membership Interests were part of the bankruptcy

---

[9]Since release of the Membership Interests, Holding Company has exercised control of Concourse and its business operations.

estate at the time of the bankruptcy filing, and (2) in the alternative, the bankruptcy estate retained a right of redemption in the Membership Interests.  It asks us to remand the case for bankruptcy proceedings with the Membership Interests, or alternatively the right of redemption, included in the bankruptcy estate.  "Like the district court, we review the bankruptcy court's factual findings for clear error, and its conclusions of law de novo."  Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.), 284 F.3d 216, 224 (1st Cir. 2002).

**II.**

**A. The Effect of the Standstill and Escrow Agreements on the Interests of the Parties in the Membership Interests at the time of the Bankruptcy Filing**

The commencement of a bankruptcy case creates a debtor's estate, which is comprised of "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  Generally, state law determines what interests the debtor holds in property.  See, e.g., Butner v. United States, 440 U.S. 48, 54 & n.9 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.");  Musso v. New York State Higher Educ. Servs. Corp. (In re Royal Business School, Inc.), 157 B.R. 932, 940-42 (Bankr. E.D.N.Y. 1993) (looking to state law to determine what rights the debtor had under an escrow agreement).  A bankruptcy estate cannot succeed to a greater interest in property

-9-

than the debtor held prior to bankruptcy.  11 U.S.C. § 541(d); see also  Ga. Pac. Corp. v. Sigma Serv. Corp., 712 F.2d 962, 968 (5th Cir. 1983) ("[T]he rule is elementary that the estate succeeds only to the title and right in the property that the debtor possessed . . . .")(quotations omitted); TTS, Inc. v. Citibank, N.A. (In re TTS, Inc.), 158 B.R. 583, 585 (D. Del. 1993) ("Section 541 does not give the debtor any greater rights to property than the debtor had before filing for Chapter 11.").  Thus, in this case, the bankruptcy estate's interest in the Membership Interests is the same as--no more than and no less than--the interest that NTA held in the Membership Interests at the time of the bankruptcy filing.

Prior to the state court litigation that led to the signing of the Standstill and Escrow Agreements, NTA owned the Membership Interests subject to Holding Company's interest in those Membership Interests as security for Holding Company's loans to NTA.  When the parties signed the Standstill and Escrow Agreements, however, those agreements superseded previous agreements between the parties with respect to each party's rights to the Membership Interests.  At the time of NTA's bankruptcy filing, the bankruptcy estate's rights to the Membership Interests were defined by those agreements.  See In re TTS, Inc., 158 B.R. at 586 (stating that the court must "consider the escrow agreement to determine the extent of each party's interest in the escrow account").

The Standstill and Escrow Agreements significantly altered the rights of the parties to the Membership Interests and, concomitantly, to control over the business of Concourse itself. NTA could no longer assign, sell, or use the Membership Interests as collateral without the permission of Holding Company. Paragraph 7 of the Standstill Agreement allowed NTA to exercise operating control over Concourse only so long as it avoided any of the triggering events. The Standstill Agreement required Concourse to provide detailed monthly cash flow statements to Holding Company and prevented Concourse from making capital expenditures or taking on new debt without Holding Company's approval. Whereas under the loan agreement Holding Company merely had a security interest in the Membership Interests, with no right to control the conduct of Concourse's business, the Standstill Agreement permitted Holding Company to exercise substantial control over Concourse's business and the Membership Interests.

In essence, the Standstill Agreement left NTA with only a limited right to the Membership Interests, best described as a contingent right to reclaim the Interests by meeting certain financing requirements. If NTA obtained new financing for Concourse during the time frame set out in the Standstill Agreement, it could pay off the balance of the loan and effectively "buy back" the Membership Interests from Holding Company. If, however, it did not obtain new financing in the time and in the

manner specified by the Standstill Agreement, the Membership Interests would be distributed from escrow to Holding Company. Thus, after it signed the Standstill and Escrow Agreements, and deposited its Membership Interests into escrow, NTA's right to the Membership Interests was simply a contractual right to prevent their distribution to Holding Company and to buy them back by meeting the requirements for new financing outlined in the Standstill Agreement.

The bankruptcy estate can no longer exercise the contingent interest that NTA held in the Membership Interests pursuant to the Standstill and Escrow Agreements.[10] NTA did not provide a letter of intent by April 30, 2003, and therefore did not fulfill the requirements necessary to prevent distribution of the Membership Interests to Holding Company under the terms of the Standstill Agreement. If NTA had not filed for bankruptcy, there would be no dispute that the Membership Interests should be

_____

[10]Appellees argue that this conclusion requires us to find that appellants' claim is moot. Appellants argue that appellees have taken a contradictory position in prior proceedings and are thus estopped from raising a mootness argument. We do not decide whether appellants' claim is moot. However, in addressing the merits of that claim, we must determine the specific rights to the Membership Interests that appellants held under the Standstill Agreement. These rights were, by the terms of that agreement, time sensitive, i.e., the Agreement allowed NTA to reclaim the Membership Interests only by securing new financing within a limited time period. Thus, the question of whether the bankruptcy estate has any interest in the Membership Interests necessarily requires us to consider the time periods outlined in the Standstill Agreement.

distributed to Holding Company. With this litigation, NTA effectively seeks to expand its rights to the Membership Interests by claiming that, through its bankruptcy filing, it could avoid the distribution of the Membership Interests that would have occurred under the terms of the Standstill and Escrow Agreements. However, as we have stated, the bankruptcy estate cannot hold a greater interest in property than the debtor held prior to bankruptcy. In this case, NTA's contingent right, and therefore the bankruptcy estate's contingent right, to "buy back" the Membership Interests under the terms of the Standstill Agreement has expired. Therefore, the bankruptcy estate has no remaining property interest in the Membership Interests.

**B. The Parties' Rights to the Membership Interests under Illinois Law**

We reach our conclusions regarding the Standstill and Escrow Agreements under Illinois law, which we now describe in greater detail.[11] "The law in Illinois regarding conditional delivery into escrow is well-established. Delivery of a deed into escrow does not convey title when the conveyance is contingent upon the occurrence of an event that entitles the grantee to the possession of the deed." Miguel v. Belzeski, 797 F. Supp. 636, 641

---

[11]The parties agree that Illinois law governs both the Standstill and Escrow Agreements. "Where the parties have agreed to the choice of law, this court is free to forgo an independent analysis and accept the parties' agreement." Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp., 317 F.3d 16, 20 (1st Cir. 2003)(quotation omitted).

(N.D. Ill. 1992).[12] Although legal title does not transfer upon placing property in escrow, the grantor does not necessarily hold the same rights to the property as he did prior to the deposit. Rather, "[w]hen property is delivered in escrow, a trust is created." FDIC v. Knostman, 966 F.2d 1133, 1140 (7th Cir. 1992); see Stark v. Chicago Title & Trust Co., 45 N.E.2d 81, 84 (Ill. App. Ct. 1942) ("From the time the deposit is made the [Escrow Agent] becomes the trustee of both the party making the deposit and the one for whose benefit it is made."); Restatement (Second) of Trusts § 32 cmt. d (1959) ("At the time of the delivery in escrow there is a presently created trust . . . ."). The beneficiary of the trust holds an "equitable interest" in the property, consisting of the right to obtain legal title to the property pursuant to the terms of the contractual agreements between the parties. Merchant's Nat'l Bank of Aurora v. Frazier, 67 N.E.2d 611, 617 (Ill. App. Ct. 1946) ("[A] trust may be said to exist where the legal estate is in one person and the equitable estate is in another, or where there are rights, titles and interest in property distinct from the legal ownership thereof."); see also Berger, Shapiro & Davis, P.A., v. Haeling (In re Foos), 183 B.R. 149, 158 (Bankr. N.D. Ill. 1995) (stating that the beneficiaries "hold the equitable title to the

_____

[12]Illinois law in this area is similar to the law in other states. See, e.g., In re Royal Business School, Inc., 157 B.R. at 940 ("In New York, as in most other states, legal title to property placed in escrow remains with the grantor pending the fulfillment of the conditions agreed upon in the escrow agreement.").

-14-

trust property pursuant to the trust agreement") (applying Illinois law).  Thus, under Illinois law, when a grantor places property into escrow, the grantee holds an equitable interest in the escrowed property, defined by the agreements between the parties, even before the property is released and the grantee takes legal title.[13]

In this case, once the parties signed the Standstill and Escrow Agreements and placed the Membership Interests in escrow, Holding Company had an equitable interest in the Membership Interests that consisted of the right to obtain legal title to the Membership Interests pursuant to the terms of the Standstill and Escrow Agreements.  Similarly, NTA could only reclaim the Membership Interests by fulfilling the terms for new financing pursuant to the Standstill and Escrow Agreements.  As stated above, under the bankruptcy code, NTA's estate can only hold the interest

---

[13]Other states have a similar framework for the transfer of property in escrow.  See, e.g., Wilson v. United Sav. of Texas (In re Missionary Baptist Found., Inc.), 792 F.2d 502, 504 (5th Cir. 1986) ("Texas courts hold that when a grantor executes an escrow agreement and deposits the subject matter into escrow, he retains legal title to the subject matter, with equitable title passing to the ultimate grantee."); In re TTS, Inc., 158 B.R. at 586 ("Thus, under New York law, [grantor] clearly holds legal title to the escrow account subject to the equitable interest held by [grantee]."); Zeigler v. Hathaway Ranch P'ship (In re Hathaway Ranch P'ship), 127 B.R. 859, 863 (Bankr. C.D. Ca. 1990) ("Under California law, once there is a binding and enforceable escrow agreement between the parties, . . . the grantee acquires immediate equitable title to the subject property, and upon satisfaction or performance of the escrow conditions, legal title to the property passes to the grantee.").

that NTA held at the time of the bankruptcy filing. See, e.g., N.S. Garrott & Sons v. Union Planters Nat'l Bank of Memphis (In re N.S. Garrott & Sons), 772 F.2d 462, 466 (8th Cir. 1985) ("[W]here the debtor holds bare legal title without any equitable interest, the estate acquires bare legal title without any equitable interest."). Thus, the bankruptcy estate held only the right to reclaim the Membership Interests pursuant to the parties' agreements, while Holding Company held the right to obtain legal title to the Membership Interests if NTA failed to obtain new financing under the terms and within the time frame provided in the Standstill and Escrow Agreements.

When NTA filed for bankruptcy, the Illinois court had already denied its request for an injunction, and the Standstill Agreement required that the Membership Interests be released to Holding Company in a matter of hours. Thus, at the time of the bankruptcy filing, NTA's contingent right to reclaim the Membership Interests had expired, with only the two business day waiting period to lapse before the Membership Interests would be distributed to Holding Company. Pursuant to both Illinois escrow law and federal bankruptcy law, NTA's bankruptcy estate succeeded only to this minimal interest. NTA's bankruptcy filing could not prevent operation of the Standstill and Escrow Agreements by making the Membership Interests the property of the bankruptcy estate. See In re Prairie Crossing, 44 Collier Bankr. Cas.2d 1865 (N.D.

-16-

Ill. 2000) ("Debtor gave up its legal rights to equity in the property when it agreed to execute and deliver a deed pursuant to the escrow provisions.") (interpreting Illinois law).

Our holding that the Membership Interests are not part of NTA's bankruptcy estate is consistent with the treatment given by other courts to property placed in escrow prior to a party filing for bankruptcy protection. See 5-541 Collier on Bankruptcy § 541.09A (15th ed. rev. 2004) ("In general, most courts have held that assets in escrow are not property of the estate, even though the debtor may have certain rights under an escrow agreement and, therefore, in the assets escrowed."); Gulf Petroleum, S.A. v. Collazo, 316 F.2d 257, 261 (1st Cir. 1963) ("Courts of bankruptcy recognize that money held in escrow is not property which vests in the trustee in bankruptcy . . . ."). In general, an estate holds only the same contingent rights to the escrowed property that the debtor held prior to filing for bankruptcy. See In re Royal Business School, Inc., 157 B.R. at 940 ("[T]he predominant rule is that a subsequent judgment or release of escrow monies does not deprive the estate of anything of value since the debtor reserves only a contingent right to the escrowed funds."). In this case, the Membership Interests are not part of the bankruptcy estate because the bankruptcy filing could not prevent the distribution of the Interests pursuant to the Standstill and Escrow Agreements.

Appellants argue that, even if the Membership Interests are not part of the bankruptcy estate, the estate at least owns a right to redeem those interests. As noted, prior to the execution of the Standstill and Escrow Agreements, Holding Company held only a security interest in the Membership Interests. Arguing that the execution of the Standstill and Escrow Agreements did not alter this arrangement, appellants contend that, as a security agreement, the Standstill and Escrow Agreements are governed by Illinois's version of the Uniform Commercial Code, which provides a statutory right of redemption pursuant to 810 Ill. Comp. Stat. 5/9-623.[14]

The Standstill and Escrow Agreements did not preserve or create a security interest in the Membership Interests. Under the earlier loan agreements, Holding Company had a perfected security interest in the Membership Interests, and it could have pursued state court proceedings to foreclose on the collateral after Concourse's alleged default. Instead, Holding Company and NTA entered into new agreements--the Standstill and Escrow Agreements-- whereby NTA gave up control of its Membership Interests and retained only a contingent right to "buy back" those interests by

---

[14]As stated <u>supra</u> Part I, the bankruptcy court did not address the right to redeem issue. The district court ruled that NTA had not waived this argument, but nevertheless decided that any right to redemption had been extinguished prior to NTA's bankruptcy filing. We assume, without deciding, that NTA has not waived this argument and address it on the merits.

obtaining new financing in the manner and within the time frame described in the Standstill Agreement. From that point forward, Holding Company's rights in the Membership Interests were defined by the terms of the Standstill Agreement and consisted of a right to take immediate title to the Membership Interests, subject to the two business days condition, if Concourse failed to obtain new financing. This substantial right to the Membership Interests cannot be described as a mere security interest for Holding Company's loans to Concourse.

Moreover, "in the absence of a separate written security agreement, there must be some language reflecting the parties' desire to grant a security interest." Eagle Bank v. Cmty. Bank of Trenton (In re Zurliene), 97 B.R. 460, 464 (Bankr. S.D. Ill. 1989) (interpreting Illinois law). There is no such language in the Standstill and Escrow Agreements. The parties in this case were sophisticated actors in a complex business transaction who had previously executed a loan agreement granting Holding Company a security interest in the Membership Interests. If they had intended the Standstill and Escrow Agreements merely to grant a security interest once again, they could have made that intent clear in the text of the new agreements. They did not do so; instead, they entered into new agreements that substantially altered each party's rights to the Membership Interests. These

alterations preclude NTA's argument that the bankruptcy estate has the right to redeem the Membership Interests.

### IV.

Our holding does nothing more than effectuate the agreement between the parties. If NTA had not filed for bankruptcy, the Membership Interests would have been released to Holding Company pursuant to the Standstill and Escrow Agreements. As the bankruptcy estate cannot hold a greater interest in property than the debtor held prior to filing for bankruptcy, NTA's bankruptcy filing could not prevent the operation of the parties' valid agreements.

For the foregoing reasons, the judgment of the district court is **AFFIRMED**.

**So ordered.**