# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 23, 2011      Decided February 17, 2012

No. 10-1328

ALLIED MECHANICAL SERVICES, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITED ASSOCIATION OF JOURNEYMEN AND APPRENTICES OF
THE PLUMBING AND PIPEFITTING INDUSTRY OF THE UNITED
STATES AND CANADA, AFL-CIO, UNION LOCAL 357,
INTERVENOR

———

Consolidated with 10-1385

———

On Petition for Review and Cross-Application for
Enforcement of
Orders of the National Labor Relations Board

———

*David M. Buday* argued the cause for petitioner. With him
on the briefs was *Keith E. Eastland*.

*Steven B. Goldstein*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Tinamarie Pappas* was on the brief for intervenor.

Before: KAVANAUGH, *Circuit Judge*, and EDWARDS and SILBERMAN, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This appeal focuses on two Decisions and Orders issued by the National Labor Relations Board ("the Board" or "the NLRB"): *Allied Mechanical Services, Inc.*, 341 N.L.R.B. 1084 (2004) ("*Allied*"), and *Allied Mechanical Services, Inc.*, 351 N.L.R.B. 79 (2007) ("*Allied Supp.*"). Allied Mechanical Services, Inc. ("Allied" or "the Company") has petitioned for review to challenge certain aspects of the Board's actions, and the Board has cross-petitioned for enforcement.

In *Allied*, the Board determined that the Company had violated sections 8(a)(3) and 8(a)(1) of the National Labor Relations Act ("the Act"), *see* 29 U.S.C. § 158(a)(3), (a)(1) (2006), by refusing to consider and hire four job applicants because of their union membership and by refusing to reinstate ten strikers upon their unconditional offers to return to work. The Company does not contest these determinations on appeal.

In *Allied Supp.*, the Board found that Allied and Local Union 357 of the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO ("the Union" or "Local 357") had a section 9(a) bargaining relationship, *see* 29 U.S.C. § 159(a) (2006), and that Allied therefore violated sections

8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5), (a)(1), by unilaterally changing its job-application procedures, by refusing to furnish information to the Union, and by withdrawing recognition from the Union. The Board ordered Allied to cease and desist from its unlawful activities and to recognize and, upon request, bargain with the Union. *Allied Supp.*, 351 N.L.R.B. at 82–87.

The principal question before the court is whether the relationship between the Company and the Union – which has extended over two decades – is governed by section 8(f), 29 U.S.C. § 158(f), or section 9(a) of the Act. Under sections 9(a) and 8(a)(5), employers are obligated to bargain with unions that have been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes." 29 U.S.C. § 159(a); *see also id*. § 158(a)(5) (making it an unfair labor practice to refuse to bargain with a union selected in accordance with section 9(a)). "[S]ection 8(f) creates a limited exception to this majority support requirement for the construction industry. Under this exception, a contractor may sign a 'pre-hire' agreement with a union regardless of how many employees authorized the union's representation." *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003) (citation omitted). An employer is not obliged to enter an 8(f) bargaining relationship. And if an employer purports to enter an 8(f) relationship, but never executes an agreement with the union, the employer is free to withdraw from the relationship. In addition, "an employer may refuse to bargain after a section 8(f) agreement expires because the union enjoys no presumption that it ever had majority support." *Id*. (citation omitted). Allied contends that the Company and the Union never entered into anything more than an 8(f) relationship, from which the Company was free to withdraw. We disagree.

We hold that substantial evidence in the record, reasoned

decisionmaking, and established case law support the Board's finding that Allied and the Union were parties to a 9(a) bargaining relationship. In April 1990, the Union requested recognition as the majority representative of Allied's employees and offered to give proof of its majority status. Allied declined to recognize the Union. The Union then filed unfair labor practice charges. In December 1990, the Board's General Counsel issued a Complaint against the Company. The Complaint stated that the Union represented a majority of Allied's employees, and it sought a "*Gissel* bargaining order." *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614–15 (1969). Rather than contest the Complaint, Allied signed an agreement settling the matter. The settlement agreement provided that Allied would recognize and bargain in good faith with the Union as the exclusive collective bargaining representative of the unit employees. The Board's decision – that the circumstances surrounding the execution of the settlement agreement, as well as the agreement itself, established a 9(a) bargaining relationship – is eminently reasonable. Finding no merit in Allied's petition for review, we hereby grant the Board's cross-petition for enforcement.

## I. BACKGROUND

### A. The Facts

Allied employs plumbers and pipefitters in southwestern Michigan. The instant dispute arose in 1990, when Local 337 engaged in a campaign to organize Allied's plumbing and pipefitting employees. On April 24, 1990, Local 337 asserted to Allied that the Union represented a majority of the Company's employees. The Union demanded that Allied recognize the Union as the employees' collective bargaining representative and offered to give proof of its majority status to a third party. The Company, however, declined to recognize the Union.

On December 13, 1990, in response to unfair labor practice

charges filed by the Union, the Board's General Counsel issued a Complaint against the Company. The Complaint stated that a majority of Allied's employees had designated the Union as its collective bargaining representative through authorization cards, and that Allied had committed serious violations of the Act effectively undermining the Union's status. *See* I Joint App. ("J.A.") 407–09. The Complaint sought a *Gissel* bargaining order on the grounds that the Company's unlawful conduct was

> so serious and substantial in character that the possibility of erasing the effects of these unfair labor practices and of conducting a fair election after the use of traditional remedies is slight and the employees' sentiments regarding representation, having been expressed through authorization cards, would, on balance, be better protected by the entry of a remedial order requiring [Allied] as of April 24, 1990, to recognize and bargain with the [Union] as the exclusive collective bargaining representative of its [unit] employees . . . than by traditional remedies.

*Id*. at 409. The Complaint further demanded that Allied

> [r]ecognize and, upon request, bargain in good faith with the [Union] as the exclusive collective bargaining representative of the [unit] employees . . . respecting rates of pay, wages, hours, and other terms and conditions of employment; and if an understanding is reached, embody it in a signed agreement.

*Id.* at 410.

In its answer to the Complaint, Allied stated that it had "no factual basis upon which to admit or deny" that the Union represented a majority of the employees in an appropriate bargaining unit. The answer additionally demanded proof of the Union's majority status, and there is nothing to indicate that the Company did not receive the proof. Instead, on July 30, 1991,

the Company signed a settlement agreement which was approved by the Board's Regional Director. The Complaint was then withdrawn.

The agreement included a non-admission clause stating that "[t]he Charged Party does not, by the execution of this Agreement, admit that it has, in fact, violated the Act." *Id.* at 417. More particularly, however, the settlement agreement provided that Allied would

> recognize and, upon request, bargain in good faith with [the Union] as the exclusive collective bargaining representative of the [unit] employees . . . with respect to rates of pay, wages, hours, and other terms and conditions of employee [sic], and if an understanding is reached, embody it in a signed collective bargaining agreement.

*Id.* at 419. There is nothing in the Board's Complaint, Allied's responses to the Complaint, or the settlement agreement to suggest that the Board, the Company, or the Union assumed that the relationship between Allied and the Union was governed by section 8(f).

During 1992 and 1993, ten Allied employees engaged in an economic strike. *See Allied Mech. Servs., Inc.*, 320 N.L.R.B. 32, 32 (1995), *enforced* 113 F.3d 623 (6th Cir. 1997) ("*Allied 1995*"). Nine of the strikers eventually made unconditional offers to return to work, but Allied refused to reinstate them. Charges were filed with the Board, and a Complaint was issued against the Company. The Board found violations of sections 8(a)(3) and (1) of the Act, and ordered the Company to reinstate and make whole the nine strikers. *See id.* at 33–34. On May 16, 1997, the Sixth Circuit enforced the Board's order. *Allied 1995*, 113 F.3d at 624.

During the course of the *Allied 1995* litigation, more problems arose between the Company and the Union, giving rise

to further litigation. *See Allied Mech. Servs., Inc.*, 332 N.L.R.B. 1600 (2001) ("*Allied 2001*"). The Union again filed unfair labor practice charges, and a Complaint was issued, alleging that Local 337 had been the section 9(a) representative of Allied's unit employees since the 1991 settlement, and that Allied had committed multiple violations of the Act. Allied denied both that Local 337 was the section 9(a) representative of its employees and that it had violated the Act.

The decision of the Administrative Law Judge ("ALJ") in *Allied 2001* stated that the Union was the "certified" representative of Allied's employees. *Id.* at 1600 n.1, 1607, 1608, 1611. Allied filed an exception and argued before the Board that, while it had "voluntarily recognized the Union" pursuant to the 1991 settlement agreement, there was "no evidence to support the Union being a Section 9(a) or a certified bargaining representative of the employees" of Allied. I J.A. 192, 221–23.

The Board found, *inter alia*, that Allied had violated section 8(a)(5) of the Act, *see Allied 2001*, 332 N.L.R.B. at 1601, but made no explicit finding as to whether the parties' relationship was governed by section 8(f) or section 9(a). The parties dispute whether collateral estoppel bars Allied from now arguing that it was in an 8(f) relationship with the Union: The Board argues that the decision in *Allied 2001* was necessarily predicated on a finding of a section 9(a) relationship, *see* Resp't's Br. at 53–56; Allied counters that collateral estoppel does not apply here, *see* Pet'r's Br. at 17. In light of the decision that we reach in this case, it is unnecessary for us to resolve the parties' dispute over collateral estoppel. The Board's decision in *Allied 2001* is currently on appeal, so we will have nothing further to say about the matters at issue in that case.

On March 1, 1998, the United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL-CIO, merged Local 337 with

Local 513 to create Local 357. Local 337 was then succeeded by Local 357.

## B.  The Instant Litigation

During 1998, Allied declined to offer ten strikers reinstatement, despite their unconditional offers to return to work. The Company also declined to hire four job applicants because of their union membership. The Board found that this conduct violated sections 8(a)(3) and 8(a)(1) of the Act. *Allied*, 341 N.L.R.B. at 1084–85; *Allied Supp.*, 351 N.L.R.B. at 79. Allied does not contest these findings.

Allied also does not dispute having engaged in other conduct during 1998, the legality of which turns on the nature of the relationship governing the parties. First, in June 1998, the Union requested information from Allied, which Allied supplied only in part. *Allied Supp.*, 351 N.L.R.B. at 81. Second, in July 1998, Allied withdrew recognition from the Union. *Id.* Finally, in August 1998, Allied revised its job-application procedure to require applicants to apply in person at its office in Kalamazoo, Michigan, without providing notice to the Union. *Id.*

In June 1999, the Board issued the instant Complaint. *Allied*, 341 N.L.R.B. at 1089. On February 8, 2000, the ALJ concluded, *inter alia*, that (1) Allied's relationship with the Union was governed by section 8(f); (2) Because Local 337's members had not been given the opportunity to vote on the merger, Local 357 did not succeed to Local 337's bargaining rights; and (3) Allied had bargained for a reasonable period of time as required by the 1991 settlement. *See id.* at 1098–99. However, the ALJ found that Allied had violated the Act by refusing to reinstate strikers and by refusing to hire job applicants because of their union membership. *Id.* at 1125.

In 2004, the Board found that Local 357 did not succeed to Local 337's bargaining rights pursuant to the merger. The Board, therefore, concluded that Allied was not required to

bargain with Local 357. *Id.* at 1084. The Board declined to determine whether the relationship between Allied and the Union was governed by section 8(f) or section 9(a). *Id.* at 1084–85.

In 2007, the Board issued a Supplemental Decision and Order revising its initial decision. Relying on *Raymond F. Kravis Center for the Performing Arts*, 351 N.L.R.B. 143 (2007), *enforced* 550 F.3d 1183 (D.C. Cir. 2008), the Board found that the absence of a vote on the merger did not permit Allied to withdraw recognition, *see Allied Supp.*, 351 N.L.R.B. at 80. The Board also determined that Allied had a section 9(a) bargaining relationship with the Union, because (1) the 1991 agreement and extrinsic evidence indicated as much, and (2) *Allied 2001* collaterally estopped the Company from arguing otherwise. *Id.* at 82–84. The Board thus determined that Allied had violated the Act when it unilaterally changed its application procedure, refused to furnish information to the Union, and withdrew recognition from the Union. *See id.* at 84.

On May 30, 2008, a two-member Board denied Allied's motion for reconsideration. *Allied Mech. Servs., Inc.*, 352 N.L.R.B. 662 (2008). Allied petitioned this court for review. On June 17, 2010, the Supreme Court issued its decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), making it clear that a panel of the Board must "maintain a membership of three in order to exercise the delegated authority of the Board," *id.* at 2644. This court then remanded the case for further proceedings before the Board. *See Allied Mech. Servs., Inc.*, 356 N.L.R.B. No. 1 (Oct. 14, 2010). On remand, a properly constituted panel of the Board ruled that, "[h]aving considered [Allied's] motion for reconsideration and the parties' briefs, the Board has decided to deny the motion for reconsideration for the reasons set forth in the Order reported at 352 NLRB 662 (2008), which is incorporated herein by reference." *Id.* Allied then filed the instant petition for review.

## II. ANALYSIS

### A. Standard of Review

This court reviews the Board's factual findings for substantial evidence, upholds the Board's application of law to facts "unless arbitrary or otherwise erroneous," *N.Y. & Presbyterian Hosp. v. NLRB*, 649 F.3d 723, 729 (D.C. Cir. 2011) (citations omitted) (internal quotation marks omitted), and gives "substantial deference" to inferences the Board draws from the facts, *Halle Enters., Inc. v. NLRB*, 247 F.3d 268, 271 (D.C. Cir. 2001) (citation omitted) (internal quotation marks omitted). Furthermore, where "'the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the [Board's] answer is based on a permissible construction of the statute.'" *NLRB v. United Food & Commercial Workers Union, Local 23*, 484 U.S. 112, 123 (1987) (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984)); *see also Hammontree v. NLRB*, 925 F.2d 1486, 1491 (D.C. Cir. 1991) (en banc).

The "function of striking [the] balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *ABC, Inc. v. Writers Guild*, 437 U.S. 411, 431 (1978) (alteration in original) (citations omitted) (internal quotation marks omitted); *see also NLRB v. Curtin Matheson Scientific, Inc.*, 494 U.S. 775, 786 (1990) ("This Court has emphasized often that the NLRB has the primary responsibility for developing and applying national labor policy." (citations omitted)); *Exxel/Atmos, Inc. v. NLRB*, 28 F.3d 1243, 1249 (D.C. Cir. 1994) ("It is up to the Board, not the courts, to make labor policy." (citation omitted)). Therefore, we must accord considerable deference to policy judgments of the Board. *See Curtin Matheson*, 494 U.S. at 786; *Pittsburgh Press Co. v. NLRB*, 977 F.2d 652, 662 (D.C. Cir. 1992) ("We are mindful of the deference we owe the Board's

expertie and judgment . . . ." (citation omitted)).

## B. Summary Enforcement of the Board's Findings of 8(a)(3) and 8(a)(1) Violations

Because Allied does not contest the Board's determinations that it violated sections 8(a)(3) and (1) by refusing to reinstate ten strikers and hire four union applicants, we summarily enforce the Board's findings and order on these charges. *See Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 885 (D.C. Cir. 1997); *Int'l Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 778 n.1 (D.C. Cir. 1992).

## C. Bargaining Relationships Under Sections 9(a) and 8(f)

Under section 9(a), a union that has been "designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representative[] of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, or other conditions of employment." 29 U.S.C. § 159(a). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representative[] of [its] employees, subject to the provisions of [section 9(a)]." 29 U.S.C. § 158(a)(5). And section 8(a)(1) makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [section 7]." *See id.* § 158(a)(1); *id.* § 157 (2006).

The Board explained the principal differences between sections 8(f) and 9(a) as follows:

> Section 8(f) . . . permits unions and employers in the construction industry to enter into collective-bargaining agreements without the union having to establish that it has the support of a majority of the employees in the covered unit. The provision therefore creates an

12

exception to Section 9(a)'s general rule requiring a showing of majority support of unit employees for the union. Section 8(f) also creates an exception to the general rule that an employer and a union lacking majority support of unit employees commit unfair labor practices by entering into a bargaining relationship with respect to those employees.

. . . [A]n 8(f) relationship may be terminated by either the union or the employer upon the expiration of their collective-bargaining agreement. By contrast, a 9(a) relationship (and the associated obligation to bargain) continues after contract expiration, unless and until the union is shown to have lost majority support. Similarly, an 8(f) contract does not bar a representation petition under Section 9, while a contract made with a 9(a) representative does bar such a petition.

*Allied Supp.*, 351 N.L.R.B. at 81 (citations omitted) (quoting *Madison Indus. Inc.*, 349 N.L.R.B. 1306, 1307 (2007)).

It is undisputed that companies and unions in the construction industry may be parties to section 9(a) bargaining relationships. *See, e.g.*, *M & M Backhoe Serv., Inc. v. NLRB*, 469 F.3d 1047, 1050 (D.C. Cir. 2006). Indeed, the Board has made it clear that "unions [do not] have less favored status with respect to construction industry employers than they possess with respect to those outside the construction industry." *John Deklewa & Sons, Inc.*, 282 N.L.R.B. 1375, 1387 n.53 (1987), *enforced sub nom. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). However, bargaining relationships in the construction industry are presumed to be covered by section 8(f). Any party who asserts that a company and union in the construction industry are parties to a section 9(a) relationship carries the burden of proving it. *Deklewa*, 282 N.L.R.B. at 1385 n.41.

In *Staunton Fuel & Material, Inc., d/b/a Central Illinois Construction*, 335 N.L.R.B. 717 (2001), the Board held that, when a union and employer execute a collective bargaining agreement that appears to convert an 8(f) bargaining relationship into a 9(a) bargaining relationship,

> [a] recognition agreement or contract provision will be independently sufficient to establish a union's 9(a) representation status where the language unequivocally indicates that (1) the union requested recognition as the majority or 9(a) representative of the unit employees; (2) the employer recognized the union as the majority or 9(a) bargaining representative; and (3) the employer's recognition was based on the union's having shown, or having offered to show, evidence of its majority support.

*Id.* at 719–20 (footnote omitted). However, the Board's decision in *Central Illinois* was called into question by this court's decision in *Nova Plumbing, Inc. v. NLRB*:

> Section 8(f) represents a real benefit to both employers and unions in the construction industry, allowing them to establish bargaining relationships without regard to a union's majority status. But the Board cannot, as it did here and in *Central Illinois*, allow this relatively easy-to-establish option to be converted into a section 9(a) agreement that lacks support of a majority of employees. Otherwise the Board would be giving employers and unions "the power to completely frustrate employee realization of the premise of the Act – that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives."

330 F.3d at 537 (quoting *Int'l Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738–39 (1961)).

*Nova Plumbing* rests on a simple principle: An employer and union in the construction industry are not free to "convert"

an 8(f) relationship into a 9(a) bargaining relationship "that lacks support of a majority of employees." *Id.* at 537. *Nova Plumbing* recognizes, however, that "[contract language and intent] are perfectly legitimate *factors* that the Board may consider in determining whether the *Deklewa* presumption has been overcome." *Id.* (citation omitted). "Standing alone . . . contract language and intent cannot be dispositive *at least where . . . the record contains strong indications that the parties had only a section 8(f) relationship*." *Id.* (emphasis added).

"A union can achieve the [section 9(a)] status of a majority collective bargaining representative through either Board certification or voluntary recognition by the employer – in a contract, for example." *Kravis*, 550 F.3d at 1188 (citation omitted). In addition, the Board can order an employer to bargain with a union as a remedy for the employer's unfair labor practices, where there is a "showing that at one point the union had a majority," and the Board finds that "the possibility of erasing the effects of past practices and of ensuring a fair election . . . by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Gissel*, 395 U.S. at 614–15; *see also United Dairy Farmers Coop. Ass'n v. NLRB*, 633 F.2d 1054, 1067 (3d Cir. 1980) ("[T]he Supreme Court in *Gissel* . . . held that Section 9(a)'s requirement that representatives be 'designated or selected' by a majority of the employees did not preclude determination of majority will by means other than elections. The Court explicitly recognized the authority of the Board to issue a bargaining order . . . ." (citation omitted)).

Once a union achieves section 9(a) status, an employer will be found to have violated section 8(a)(5) if it breaches its duty to bargain with the union, fails to provide information necessary for the union to act as the employee representative, or

unilaterally changes conditions of employment. *See M & M Backhoe*, 469 F.3d at 1051.

If an employer and union convert from an 8(f) to a 9(a) bargaining relationship based on the union's offer to provide evidence of its majority status, the employer cannot thereafter withdraw from the relationship "solely because the employer never took the union up on its offer." *Id.* So long as the union had evidence to support its majority status, the employer is not free to walk away from the 9(a) relationship. "To rule otherwise would be to allow the employer to frustrate the employees' section 7 rights by turning its back to the union's evidence." *Id.* (citing *Gissel*, 395 U.S. at 596–98).

Allied's claim in this case is quite simple. The Company does not appear to dispute that if it was in a 9(a) bargaining relationship with the Union, the unfair labor practices found by the Board would justify a *Gissel* bargaining order. Rather, Allied argues that it had nothing more than an 8(f) relationship with the Union and, therefore, it was free to withdraw recognition. Allied thus essentially concedes that the nature of the relationship between the Company and Union determines the outcome of this case.

**D.  The Nature of the Relationship Between Allied and the Union**

### 1.  *The Scenario Painted by the Facts in This Case*

Before assessing the parties' positions regarding the nature of the relationship between Allied and the Union, it is important to point out that the circumstances that gave rise to the dispute in *Nova Plumbing* are not presented in this case. *Nova Plumbing* involved "a construction company's refusal to extend its contract with a labor union." *Nova Plumbing*, 330 F.3d at 533. The Board found that the parties' collective bargaining agreement was governed by section 9(a), not section 8(f). In reaching this conclusion, "the Board relied solely on a contract

provision suggesting that the company and the union intended a 9(a) relationship despite strong record evidence that the union may not have enjoyed majority support as required by section 9(a)." *Id.* The situation in this case is quite different.

Before the Company signed the 1991 settlement agreement, the Union and Allied had not established an 8(f) relationship through the execution of a pre-hire agreement or a collective bargaining contract. Rather, the dispute in this case arose when the Union claimed that it represented a majority of the employees, offered to prove its majority status, and demanded that Allied recognize the Union as the employees' collective bargaining representative. After Allied refused to bargain, the Union filed unfair labor practice charges. The Board's General Counsel then issued a Complaint asserting that the Union had established its majority status through authorization cards. The Complaint sought a *Gissel* bargaining order, which is a remedy for a refusal to bargain in situations covered by section 9(a).

Rather than litigate the unfair labor practice charges that had been filed against it, Allied signed a settlement agreement, in which it agreed to recognize and bargain with the Union. The Board then relied on both "the relevant extrinsic evidence" and the settlement agreement in determining that Allied and the Union had a 9(a) relationship. *Allied Supp.*, 351 N.L.R.B. at 82.

> **2.** **The Evidence Supporting the Board's Finding of a 9(a) Relationship Between Allied and the Union**

Allied's principal claim is that the 1991 settlement agreement created a bargaining relationship under section 8(f). We reject this claim as utterly implausible. The Board's General Counsel could not have premised the Complaint against Allied on a charge that the Company had violated section 8(f). Section 8(f) merely *permits* unions and employees in the

construction industry to enter into collective bargaining agreements without the union's having to establish that it has the support of a majority of the employees in the covered unit. If a union and an employer enter into an 8(f) relationship and execute an agreement, the contract may be terminated by either party upon expiration. However, neither an employer nor a union is ever obliged to enter into an 8(f) relationship, and neither an employer nor a union is obliged to renew an 8(f) agreement. In this case, Allied had no obligations whatsoever under section 8(f), because the Union and the Company had no 8(f) agreement in place.

The settlement agreement had nothing to do with establishing a section 8(f) relationship, nor did the Complaint it settled allege a violation of section 8(f). Put simply, the 1991 settlement agreement resolved a Complaint that was premised on the assumption that the employer was obligated to bargain with a union that had majority status, and thus should be in a section 9(a) relationship with the employer. As the Board said: "[A] settlement agreement establishing only an 8(f) relationship would make little sense, as it would bear no relationship to the allegations of the complaint" it settled. *Allied Supp.*, 351 N.L.R.B. at 82. The non-admission clause contained in the 1991 agreement does not refute these premises; it merely provides that by executing the agreement, Allied was not admitting to having violated the Act. Allied specifically agreed to recognize and bargain with the Union without any section 8(f) caveats.

Furthermore, on the record here, the Board's decision clearly rests on a showing of union support among a majority of employees in an appropriate unit, as required by *Nova Plumbing*. Allied points to *M & M Backhoe* in support of its argument that the Union's majority status was not established. *M & M Backhoe* states: "We held in *Nova Plumbing* that an offer of proof could not substitute for actual proof." 469 F.3d at 1050. We think that this statement is *dicta*, both because it reflects an

overreading of *Nova Plumbing* and it is unnecessary to the decision in *M & M Backhoe*. The precise holding of *Nova Plumbing* is that an employer and union in the construction industry are not free to "convert" an 8(f) relationship into a 9(a) bargaining relationship "that lacks support of a majority of employees." 330 F.3d at 537. That standard has been met here. As noted above, in the instant case, the Union requested recognition as the majority representative of Allied's employees and offered to give proof of its majority status. The Complaint stated that the Union represented a majority of Allied's employees, and it sought a *Gissel* bargaining order. Indeed, the Complaint explicitly states that employee sentiments had been expressed "through authorization cards." I J.A. 409. Allied demanded proof of the Union's majority status, and there is nothing to indicate it did not receive such proof. Instead, the Company signed an agreement settling the unfair labor practice charges pending against the Company. On these facts, the Board reasonably found an 8(a)(5) violation and issued a *Gissel* bargaining order.

Allied argues that "even if the July 1991 settlement could be considered evidence of majority support, the Union's April 24, 1990 demand letter offering to make the required showing preceded the parties' agreement *by more than fourteen months*," thus precluding it from being considered a contemporaneous showing of majority support. Pet'r's Br. at 41. We agree with the Board, however, that "the very premise of a *Gissel* bargaining order is that, because of the employer's unfair labor practices, it is likely that the union will *not* be able to show that it has *maintained* its majority at the time the Board's remedies are implemented." Resp't's Br. at 53; *see Gissel*, 395 U.S. at 612–14. The settlement agreement parrots the language of *Gissel*, showing that Allied's agreement to bargain with the Union was predicated on the previous existence of majority status. *See Gissel*, 395 U.S. at 614 (allowing the Board to order an employer to bargain with a union as a remedy for the

employer's unfair labor practices where there is, *inter alia*, a "showing that at one point the union had a majority").

The settlement agreement surely was not a full collective bargaining agreement or a section 8(f) pre-hire agreement, as Allied contends. It was, instead, merely a promise by the employer to recognize and bargain with the Union with the aim of reaching a collective bargaining agreement. Nor was the 1991 agreement ever understood to be a collective bargaining agreement of any sort. In fact, it was the absence of a collective bargaining agreement that resulted in the various work stoppages that occurred after the settlement agreement was executed. As the Sixth Circuit noted in enforcing the Board's order in *Allied 1995*, Allied employees had struck in 1992 and 1993 "to protest the Company's . . . failure to negotiate a contract with the Union." *Allied 1995*, 113 F.3d at 627. If the 1991 agreement had been understood to constitute a collective bargaining agreement, those employees would have had no need to strike for one in the years following it.

Allied argues that the settlement agreement was sufficient to satisfy the terms of section 8(f), simply because it was an "agreement." *See* Pet'r's Br. at 52–53. This is a specious claim. The reference to "agreement" in section 8(f) has been understood to mean pre-hire agreements or complete collective bargaining agreements – *i.e.*, agreements that specify terms and conditions of hire and employment. *See Bufco Corp. v. NLRB*, 147 F.3d 964, 966 n.2 (D.C. Cir. 1998) ("The collective bargaining agreements were pre-hire agreements negotiated under § 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f)."); *Donald Schriver, Inc. v. NLRB*, 635 F.2d 859, 873 (D.C. Cir. 1980) ("[A]n § 8(f) prehire agreement[ is] the standard means of initiating collective bargaining in the construction industry." (footnote omitted)); *see also, e.g.*, *Nat'l Treasury Emps. Union v. Fed. Labor Relations Auth.*, 452 F.3d 793, 794 (D.C. Cir. 2006) (noting the "collective bargaining

agreement" at issue "govern[ed] the terms and conditions of employment"). The 1991 agreement contained no such provisions – to the contrary, it provided that the parties would bargain "with respect to rates of pay, wages, hours, and other terms and conditions of employ[ment]." I J.A. 419.

Finally, Allied attempts to derive significance from the fact that on June 1, 1995, the Union made a written proposal for a contract with a section 8(f) recognition clause. The Union's demand for section 8(f) status during collective bargaining four years *after* the 1991 settlement agreement, however, surely does not indicate that the 1991 agreement was a section 8(f) agreement. As the Board said:

> Local 337's written proposal, in subsequent contract negotiations, for an 8(f) recognitional clause sheds little light on the nature of the relationship created under the settlement agreement, as the record does not reveal Local 337's reasons for offering this proposal, and parties routinely offer concessions in negotiations to obtain other desired benefits. Moreover, any probative value of this contract proposal is largely negated by the fact that Local 337 also made a request, albeit orally, for 9(a) recognition during negotiations.

*Allied Supp.*, 351 N.L.R.B. at 83 n.19.

### E.     The Board's Judgment Is Consistent with *Nova Plumbing*

Allied contends that the court's decision in *Nova Plumbing* precludes enforcement of the Board's decision here. We disagree. As noted above, the record in this case is materially different from the record in *Nova Plumbing*. First, there are no "strong indications that the parties had only a section 8(f) relationship." *Nova Plumbing*, 330 F.3d at 537. Quite the contrary.

Second, the Board's decision in this case does not implicate *Nova Plumbing*'s broader concern about the possibility of employer-union collusion. This concern is inapposite here. The 9(a) relationship between Allied and the Union is predicated on a Board-approved settlement agreement that resolved a *Gissel* Complaint. The NLRB Regional Director's approval of the settlement agreement protected against the kind of collusion that might be present in a private-settlement scenario.

Finally, "[b]efore the General Counsel issues a complaint, he [or she] conducts an investigation in order to ascertain, analyze, and apply the relevant facts. According to the Board's regulations, a complaint will issue only if the charge appears to have merit. If investigation reveals that there has been no violation of the Act or evidence is insufficient to substantiate the charge, no complaint will issue." *See Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1179 (D.C. Cir. 1993) (citations omitted) (internal quotation marks omitted). We presume "that agency officials and those who assist them have acted properly." *United Steelworkers v. Marshall*, 647 F.2d 1189, 1217 (D.C. Cir. 1980) (as amended Jan. 30, 1981) (citation omitted); *see also La. Ass'n of Indep. Producers & Royalty Owners v. FERC*, 958 F.2d 1101, 1119 (D.C. Cir. 1992) (per curiam) ("Under the well-settled presumption of administrative regularity, courts assume administrative officials to be men [and women] of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances." (alteration in original) (citation omitted) (internal quotation marks omitted)); *Braniff Airways, Inc. v. Civil Aeronautics Bd.*, 379 F.2d 453, 460 (D.C. Cir. 1967) ("A strong presumption of regularity supports the inference that when administrative officials purport to decide weighty issues within their domain they have conscientiously considered the issues and adverted to the views of their colleagues." (citations omitted)). It is therefore unlikely – and even illogical – to

suppose that the Board's General Counsel would have asserted that a majority of Allied's unit employees had designated the Union as their representative through authorization cards, and that a *Gissel* bargaining order was necessary to remedy the Company's unfair labor practices, without first investigating the Union's claim of majority status and satisfying itself that a *Gissel* bargaining order was appropriate.

Allied's claims to the contrary are entirely unconvincing. The employer knew that it could seek proof of the Union's majority status, did so, and never claimed that the proof was not forthcoming before signing the settlement agreement. With so many safeguards in place, we cannot conclude that the potential for collusion was afoot. In short, we find that the concern raised by the court in *Nova Plumbing* has no play in this case.

**F.    Deference Is Due to the Board's Judgment in This Case**

Substantial evidence review "gives the agency the benefit of the doubt, since it requires not the degree of evidence which satisfies the *court* that the requisite fact exists, but merely the degree which *could* satisfy a reasonable factfinder." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 377 (1998) (citation omitted). And it does not allow a court to "supplant the agency's findings merely by identifying alternative findings that could be supported by substantial evidence." *Arkansas v. Oklahoma*, 503 U.S. 91, 113 (1992); *see also Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994) (explaining that an agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view" (citations omitted) (internal quotation marks omitted)). Substantial evidence supports the Board's determination that, based on "the relevant extrinsic evidence" and the settlement agreement, Allied and the Union had a 9(a) relationship. *Allied Supp.*, 351 N.L.R.B. at 82.

First, as noted above, the Board's General Counsel could not have premised the Complaint that was issued against Allied on a charge that Allied had violated section 8(f), because the Union and employer had no section 8(f) agreement in place. The Complaint and its settlement implicated section 9(a), not section 8(f).

Second, the record supports the General Counsel's assertion that the Union had achieved majority status. On April 24, 1990, the Union asserted to Allied that it represented a majority of the Company's plumbing and pipefitting employees, and demanded that Allied recognize the Union as the employees' bargaining agent. The Company refused the Union's demand. The Complaint filed against Allied specifically alleged that on or about April 24, 1990, a majority of Allied's plumbing and pipefitting employees had designated the Union as their exclusive collective bargaining representative through authorization cards. Allied neither admitted nor denied the Board's allegation of majority support, based on an asserted lack of "factual basis." I J.A. 413. In other words, by its answer to the Complaint, Allied essentially conceded that it had no basis upon which to dispute the Board's claim of majority status.

Finally, the Board reasonably rejected Allied's claim that Allied could withdraw from its 9(a) relationship with the Union because it had bargained for a reasonable time. On this point, the Board found

> that the Respondent was not free to withdraw recognition simply because it had bargained with Local 337 for a reasonable period of time. Because the Respondent had recognized and agreed to bargain with Local 337 under a settlement agreement, Local 337 possessed an irrebutable presumption of majority status for a reasonable period of time. Although the reasonable period had expired by the time that the Respondent withdrew recognition, that fact alone did not privilege the

Respondent's withdrawal of recognition. Rather, at that point, the presumption of majority support became rebuttable. Under the law at the time that the Respondent withdrew recognition, the Respondent could rebut the presumption of majority support and withdraw recognition by showing either that the Union had actually lost the support of a majority of the bargaining unit employees or that the employer had good-faith doubt or uncertainty, based on objective considerations, of the Union's continued majority status.

The Respondent failed to make such a showing.

*Allied Supp.*, 351 N.L.R.B. at 84 (footnotes omitted).

In sum, the record in its entirety makes it clear that the Board's judgment in this case easily survives substantial evidence review.

Administrative decisions by the Board demand a "very high degree of deference." *United Steelworkers of Am., Local Union 14534 v. NLRB*, 983 F.2d 240, 244 (D.C. Cir. 1993). Therefore, we must uphold the Board's finding that the Act has been violated, unless its adjudication "'has no rational basis' or is 'unsupported by substantial evidence.'" *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935 (D.C. Cir. 2011) (quoting *United Mine Workers of Am., Dist. 31 v. NLRB*, 879 F.2d 939, 942 (D.C. Cir. 1989)). "[T]he Board is to be reversed only when the record is so compelling that no reasonable factfinder could fail to find to the contrary." *Bally's*, 646 F.3d at 935 (citation omitted) (internal quotation marks omitted). Where, as here, the Board disagrees with the ALJ, "the standard of review with respect to the substantiality of the evidence does not change," because "in the end it is the Board that is entrusted by Congress with the responsibility for making findings under the statute." *Id.* at 935 n.4 (citation omitted) (internal quotation marks omitted).

In examining specifically whether a section 8(f) or 9(a) relationship was present, our inquiry is whether the Board's conclusion was "reasonable." *See Kravis*, 550 F.3d at 1189 (deferring to the Board's finding of section 9(a) status where the Board "reasonably" reached its conclusion); *see also NLRB v. Local Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 434 U.S. 335, 350 (1978) ("The Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference. Courts may prefer a different application of the relevant sections, but '[t]he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review.'" (alteration in original) (citations omitted)). Given the circumstances recited above, there is little doubt that we owe deference to the Board's judgment in this case.

## III. CONCLUSION

More than twenty years ago, Allied asked for proof of majority status, then, via agreement, settled a Complaint seeking a *Gissel* bargaining order. Allied agreed to bargain based on the premise of a section 9(a) relationship. Years later, the Company asserted that it had nothing more than a section 8(f) relationship with the Union. Given the settlement agreement and the context in which it was executed, the Board's rejection of Allied's claims are well founded and deserve our deference. Accordingly, we deny Allied's petition for review and grant the Board's cross-petition for enforcement.