# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 13, 2006          Decided December 1, 2006

No. 05-1378

M&M BACKHOE SERVICE, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL UNION OF OPERATING ENGINEERS, LOCAL
487, AFL-CIO,
INTERVENOR FOR RESPONDENT

Consolidated with
05-1412 and 05-1433

On Petitions for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

*Michael E. Avakian* argued the cause and filed the briefs for
petitioner M&M Backhoe Service, Inc.

*Osnat K. Rind* argued the cause and filed the briefs for petitioner International Union of Operating Engineers, Local 487, AFL-CIO.

*Gregory P. Lauro*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Fred B. Jacob*, Attorney.

Before: HENDERSON, RANDOLPH and GRIFFITH, *Circuit Judges*.

RANDOLPH, *Circuit Judge*: The threshold issue in these consolidated petitions for review of an order of the National Labor Relations Board and the Board's cross-application for enforcement is whether M&M Backhoe Service, Inc., voluntarily recognized the union's majority status and converted the relationship between the company and the union from one governed by section 8(f) of the National Labor Relations Act to one governed by section 9(a).

The Act gives employees the right to select their own union representation. *See* 29 U.S.C. § 159(a). Employers must bargain in good faith with unions, *see id.* § 158(a)(5), but only if the union has been "designated or selected . . . by the majority of the employees in a unit appropriate for such purposes," *id.* § 159(a). The Supreme Court underscored the importance of worker self-determination decades ago in *International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731 (1961), and we reiterated the principle in *Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531 (D.C. Cir. 2003).

An exception, specific to the construction industry, permits employers to enter into pre-hire agreements with unions without

any showing of majority support. *See* 29 U.S.C. § 158(f). As we explained in *Nova Plumbing*, the exception adapts the law to conform with "the unique nature of the industry: Construction companies need to draw on a pool of skilled workers and to know their labor costs up front in order to generate accurate bids; union organizing campaigns are complicated by the fact that employees frequently work for multiple companies over short, sporadic periods." 330 F.3d at 534 (citing *NLRB v. Local Union No. 103*, 434 U.S. 335, 348-49 (1978)).

Pre-hire agreements differ from the typical collective bargaining agreement. Under section 8(f), either party may repudiate the terms of a pre-hire agreement when it expires. *See John Deklewa & Sons*, 282 N.L.R.B. 1375, 1377-78, 1386 (1987), *enforced sub nom Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 3 v. NLRB*, 843 F.2d 770 (3d Cir. 1988). The employer then has no obligation to bargain with the union, "because the union enjoys no presumption that it ever had majority support." *Nova Plumbing*, 330 F.3d at 534. Under section 9(a), by contrast, the union benefits from "a conclusive presumption of majority status during the term of any collective-bargaining agreement, up to three years." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786 (1996) (footnote omitted).

A union may convert its relationship with the employer to one governed by section 9(a) if it demonstrates support from a majority of employees in the unit. Local 487's attempt to do just that raises the principal issue in the case.

M&M is a small, Florida-based construction contracting company founded by president Robert Miley. Miley had been a member of Local 487 for more than twenty-seven years before starting M&M in 1991. From M&M's inception, the company operated under a series of pre-hire agreements with Local 487. The last agreement permitted either party to terminate it by

notifying the other party at least sixty days before June 30, 2002, its expiration date.

On March 26, 2002, Miley notified the union by letter that M&M would terminate the pre-hire agreement when it expired. The union's business manager, Gary Waters, promptly instructed a member of his staff, James Allbritton, to visit M&M's worksite and to have the employees sign authorization cards recognizing the union. Allbritton collected signed authorization cards from all seventeen of M&M's employees on March 27 and 28.

On March 29, Waters faxed Miley a letter notifying him that the union had support from the majority of M&M's employees and requesting "voluntary recognition from your firm and 9(a) status under the National Labor Relations Act." The letter asked Miley to sign the attached Recognition Agreement, which stated that M&M "acknowledges and agrees, based on a showing of signed authorization cards, that a majority of its employees have authorized the Union to represent them in collective bargaining" and that M&M "hereby recognizes the Union as the exclusive bargaining agent under Section 9(a) of the National Labor Relations Act." The letter stated that if Miley did not sign the Recognition Agreement, the union would petition the NLRB for a representation election.

Miley responded on April 2. He agreed to a collective bargaining session with the union and invited Waters to contact him about scheduling the session. Miley did not sign the Recognition Agreement at that time. On April 3, Waters called Miley and left a telephone message about the Recognition Agreement. The next day, Waters sent Miley another letter. The letter thanked Miley for agreeing to a collective bargaining session, but noted that Miley's previous letter alone was not sufficient to achieve the union's goals because "to change our

bargaining relationship from 8(f) to 9(a) status under the National Labor Relations Act, you must voluntarily recognize that the union has majority status by signing the previously provided agreement." Miley signed and returned the Recognition Agreement later that day. Before signing the Recognition Agreement, Miley did not request proof that Local 487 in fact had authorization cards from the majority of M&M's employees.

In June 2002, Miley attended two meetings in which the union negotiated with M&M and three other local contractors. At these meetings, the union demanded an increase in employer payments to the union's health care fund. The other three employers agreed to the increases the union requested. Miley wrote Waters a letter refusing those terms, explaining that "any increase at this time would be cost prohibitive." In response, Waters made a counterproposal and requested documents from M&M to establish Miley's claim of financial hardship.

On June 30, three days after Waters sent his counterproposal, the pre-hire agreement between M&M and the union expired of its own terms. The union believed that M&M had voluntarily recognized it and had concomitant obligations under section 9(a) to maintain the status quo while continuing to bargain in good faith. M&M proceeded as if the section 8(f) agreement had expired and it had no obligations to the union. In the early part of July, M&M changed its overtime policies and hired new employees without going through the union hiring hall as required by the pre-hire agreement. In response, Waters sent another letter, requesting information about the non-union hires. Also in July, M&M stopped making payments to union funds that the pre-hire agreement had required it to support.

On these facts the Board decided that Local 487 had become M&M's employees' section 9(a) representative and that

M&M had violated section 8(a)(5) of the Act by withdrawing recognition of the union, refusing to provide information to it, and unilaterally changing the terms and conditions of employment. *See M&M Backhoe Serv., Inc.*, 345 N.L.R.B. No. 29, 2005 NLRB LEXIS 452 (Aug. 27, 2005) ("*NLRB Decision*"). M&M urges us not to enforce the Board's order because it conflicts with *Nova Plumbing*.

Generally, a union seeking to convert its section 8(f) relationship to a section 9(a) relationship may either petition for a representation election or demand recognition from the employer by providing proof of majority support. *See J&R Tile, Inc.*, 291 N.L.R.B. 1034, 1036 (1988). *Nova Plumbing* presented the question of what showing a union had to make to establish majority support sufficient to transform its relationship with an employer from one governed by section 8(f) to one under section 9(a). The company there objected to the Board's position that the union's offer to provide evidence of majority support was alone sufficient, without regard to whether the union in fact had a majority. *See Nova Plumbing*, 330 F.3d at 536-37. We held that when the Board relied solely on the union's offer "the Board failed to protect the employees' section 7 rights" to determine their own representation. *Id.* at 533. "[T]his relatively easy-to-establish option . . . giv[es] employers and unions 'the power to completely frustrate employee realization of the promise of the Act – that its prohibitions will go far to assure freedom of choice and majority rule in employee selection of representatives.'" *Id.* (quoting *Int'l Ladies' Garment Workers' Union*, 366 U.S. at 738-39).

We held in *Nova Plumbing* that an offer of proof could not substitute for actual proof. 330 F.3d at 537. Nor could language in the collective bargaining agreement's recognition clause stating that evidence presented to the employer established the union's majority status. "If the Board considers contract

language in determining section 9(a) status, it must take such language seriously when a recognition clause indicates that there is a concrete basis upon which to assess employee support." *Id.* at 538.

This case is like *Nova Plumbing* in the following respects: the union offered to prove to the employer that it had majority support; and the employer recognized the union without examining the union's proof. But there is a critical difference. Unlike *Nova Plumbing*, in which there was no evidence that the union actually had majority support, here the record shows – as the Board found – that a majority of employees voluntarily signed union authorization cards signifying their support of Local 487. In fact, all seventeen of M&M's eligible employees signed authorization cards during the final week of March 2002. An employer who recognizes a union after the union offers to provide evidence of its majority status cannot revoke that recognition solely because the employer never took the union up on its offer – provided that the union actually had majority support. To rule otherwise would be to allow the employer to frustrate the employees' section 7 rights by turning its back to the union's evidence. *See NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 596-98 (1969). Under this standard, Local 487 properly converted its relationship with M&M to one governed by section 9(a), and M&M cannot disclaim the conversion after the fact.

M&M's efforts to avoid this result deserve only a few words. The company claims that its president did not know the import of the Recognition Agreement when he signed it. The Board and the Administrative Law Judge found otherwise, and for good reason. Local 487 twice demanded recognition in unmistakable terms. *Cf. Western Pipeline, Inc.*, 328 N.L.R.B. 925, 926 (1999) ("The claim for recognition need not be made in any particular form."). And the Recognition Agreement is as

clear as can be: "The Employer hereby recognizes the Union as the exclusive bargaining agent under Section 9(a) of the [Act] . . .." M&M's other contention – that some of the authorization cards were invalid for one reason or another – fails. Even if M&M were correct, the remaining cards gave the union a majority.

Because the union achieved section 9(a) status, M&M violated section 8(a)(5) when it breached its duty to bargain with Local 487, failed to provide information necessary for the union to act as the employee representative, and unilaterally changed employment conditions. The Board also found that M&M violated sections 8(a)(1) by threatening, coercing, discriminating against, and conducting surveillance of its employees. No useful purpose would be served by reciting M&M's objections to these findings, all of which turn on issues of credibility resolved against the company. We have considered and rejected each of M&M's objections. As to the Board's additional finding that the company violated section 8(a)(3) by taking adverse employment actions to discourage union membership and activity, the Board evaluates employer motivation under the *Wright Line* test. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125-26 (D.C. Cir. 2001). The *Wright Line* test considers multiple factors, of which "the employer's hostility toward the union" is but one. *Id.* Other factors include the timing of the employer's activities and the employer's knowledge of union activities. *Id.* The union and M&M each point to evidence supporting one interpretation or the other of the events leading up to and following the disciplinary actions M&M took against two employees. Even considered in the best possible light, the company's version does not rise to the threshold required to set aside the Board's factual determinations.

\* \* \*

Local 487's petition for review claims that the Board should have held M&M liable for ceasing its contributions to the union's pension, vacation, and apprenticeship trust funds. The union maintains four trust funds: health and welfare, pension, vacation, and apprenticeship. M&M cut off its contributions to all four. The Board ruled in the union's favor with respect to the health and welfare fund but, over the dissent of one member, refused to consider the other three funds because its General Counsel had not raised them in the complaint. *See NLRB Decision*, 2005 NLRB LEXIS 452 at *3-5.

The union's charge did not mention the vacation and apprenticeship funds. It alleged that M&M had "failed and refused to make fringe benefit contributions to the pension, welfare funds, thereby unilaterally changing terms and conditions of employment." The General Counsel's complaint removed the reference to the "pension" fund. The relevant paragraph of the complaint reads: "Since on or about July 1, 2002, [M&M] has ceased remitting health and welfare fund contributions, and on or about that same date and thereafter, [M&M] changed other terms and conditions of employment of employees in the Unit." Given the alteration of the charge, the Board had good reason to conclude that the company was not on notice that its contributions to the other three funds were at issue. As the Board recognized, it "may not make findings or order remedies on violations not charged in the . . . complaint or litigated in the subsequent hearing." *Chicago Local No. 458-3M v. NLRB*, 206 F.3d 22, 24 n.1 (D.C. Cir. 2000); *see NLRB v. Blake Constr. Co.*, 663 F.2d 272 (D.C. Cir. 1981). We cannot say the Board acted arbitrarily in concluding that the complaint's additional allegation – that the company changed other terms and conditions of employment – was "too vague" to put the company on notice, particularly because the health and welfare fund was specifically mentioned.

The union also argues that M&M's non-payments to the pension, vacation, and apprenticeship trust funds were fully litigated before the ALJ. The only mention of the three funds during the hearing, or at least the only mention the union cites, was in connection with an M&M stipulation during the testimony of the union's business manager. Counsel for the company stipulated that balance sheets the General Counsel sought to introduce reflected contributions the company made into the funds and that after a particular date there were no documents reflecting further contributions. The stipulation may have assisted in making the case against the company for its failure to contribute to the health and welfare funds. But we cannot say the Board abused its discretion in determining that at the time of the stipulation the company was not on notice that the other three funds were at issue and that if the General Counsel thought otherwise, the General Counsel should have moved to amend the complaint pursuant to the NLRB's procedural rules. *See* 29 C.F.R. § 102.17.

For the foregoing reasons the petitions for judicial review are denied and the cross-application for enforcement is granted.

*So ordered.*