# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――

Argued September 7, 2017 Decided June 8, 2018

No. 16-1261

COLORADO FIRE SPRINKLER, INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

ROAD SPRINKLER FITTERS LOCAL UNION NO. 669, U.A.,
AFL-CIO,
INTERVENOR

―――

Consolidated with 16-1319

―――

On Petition for Review and Cross-Application for
Enforcement of
an Order of the National Labor Relations Board

―――

*Thomas A. Lenz* argued the cause for petitioner. With him
on the briefs was *L. Brent Garrett*.

*John N. Raudabaugh* and *Glenn M. Taubman* were on the
brief for *amicus curiae* Robert Blackwell in support of
Colorado Fire Sprinkler, Inc.

*Jeffrey W. Burritt*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel at the time the brief was filed, *Jennifer Abruzzo*, Deputy General Counsel at the time the brief was filed, *John H. Ferguson*, Associate Deputy Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Usha Dheenan*, Supervisory Attorney.

*William W. Osborne Jr.* argued the cause and filed the brief for intervenor, Road Sprinkler Fitters Local Union 669, U.A., AFL-CIO.

Before: ROGERS and MILLETT, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by MILLETT, *Circuit Judge*.

MILLETT, *Circuit Judge*: When the Colorado Fire Sprinkler company's labor agreement with the Road Sprinkler Fitters Union expired, the Company announced that it would no longer recognize or negotiate with the Union as a representative of the Company's employees. The Company asserted a right under Section 8(f) of the National Labor Relations Act, 29 U.S.C. § 158(f) (which applies to labor agreements in the construction and building industries), to walk away from the union relationship. The Union begged to differ, contending that a different provision of the National Labor Relations Act, Section 9(a), 29 U.S.C. § 159(a), obligated the Company to continue negotiating in good faith with the Union. The Union filed a grievance, and the National Labor Relations Board sided with the Union. Because the Board's decision rested on insubstantial evidence and failed to address important evidence supporting the Company, we grant the Company's petition for review, deny the Board's cross-application for enforcement, vacate the Board's decision, and remand.

3

**I**

**A**

This is a tale of two statutory provisions, and of a Union's effort to move between them.

Under the more commonly employed Section 9(a) of the National Labor Relations Act, a union that obtains the support of "the majority of the employees in a unit" will become the recognized representative of those employees, and the employer will be obligated to communicate and negotiate with it on the terms and conditions of employment. 29 U.S.C. § 159(a). A union recognized under Section 9(a) "enjoys numerous benefits, including a conclusive presumption of majority status during the term of any collective-bargaining agreement, up to three years." *Raymond F. Kravis Center for the Performing Arts, Inc. v. NLRB*, 550 F.3d 1183, 1188 (D.C. Cir. 2008) (citation omitted). An employer's refusal to bargain with a union recognized as the employees' Section 9(a) representative is an unfair labor practice. *See* 29 U.S.C. § 158(a)(5).

A different rule operates in the building and construction industries. For those businesses, labor costs need to be known in advance so that companies can bid for work. In addition, union organization is difficult because projects can be relatively short-lived and employees migrate between jobs. *See Nova Plumbing, Inc. v. NLRB*, 330 F.3d 531, 534 (D.C. Cir. 2003) (explaining that Section 8(f) addresses "the unique nature" of industries that "need to draw on a pool of skilled workers and to know their labor costs up front in order to generate accurate bids," and in which employees often "work for multiple companies over short, sporadic periods").

To address those challenges, Section 8(f) of the National Labor Relations Act allows employers and unions in the building and construction industries to enter into what is known as a "pre-hire agreement." *Nova Plumbing*, 330 F.3d at 534 (citation omitted). Under such an agreement, the business and union agree in advance that a particular union will represent employees, and they may even negotiate the initial terms and conditions of employment directly between themselves. That can all occur without any vote by the employees, or even before a single employee is hired. *See* 29 U.S.C. § 158(f).

A pre-hire agreement in the construction and building industries is presumed to be governed by Section 8(f) rather than Section 9(a). *Allied Mechanical Services, Inc. v. NLRB*, 668 F.3d 758, 766 (D.C. Cir. 2012). A Section 8(f) relationship can convert into a Section 9(a) relationship only if the union "either petition[s] for a representation election or demand[s] recognition from the employer by providing proof of majority support." *M & M Backhoe Service, Inc. v. NLRB*, 469 F.3d 1047, 1050 (D.C. Cir. 2006).

Under the more commonplace Section 9(a) union representation, when a collective bargaining agreement expires, the employer generally must continue to negotiate with the union in good faith and preserve the status quo in employment terms and conditions. *See*, *e.g.*, *NLRB v. Katz*, 369 U.S. 736, 743 (1962) (holding that "an employer's unilateral change in conditions of employment under negotiation" is a violation of the National Labor Relations Act because "it is a circumvention of the duty to negotiate"); *Nova Plumbing*, 330 F.3d at 534 (noting that, under Section 9(a), when a collective bargaining agreement expires, an employer must "continue bargaining * * * unless the company can demonstrate either that the union has in fact lost majority

support or that the employer has a good faith uncertainty as to the union's status").

Not so for Section 8(f) agreements. For them, the employer (or the union) "may repudiate the terms of a pre-hire agreement when it expires," and the employer has "no obligation to bargain with the union" upon expiration. *M & M Backhoe*, 469 F.3d at 1048.

That is all a long way of saying that, when a labor agreement expires, an employer's rights and obligations under Section 8(f) and Section 9(a) of the National Labor Relations Act are substantially different. And therein lies the rub in this case.

**B**

Colorado Fire Sprinkler, Inc., installs, services, and inspects fire sprinkler systems across commercial properties in Southern Colorado. Ken Stringer founded the Company in 1991 and still serves as its sole owner. At the time of the Company's founding, Stringer entered into a Section 8(f) pre-hire agreement with the Road Sprinkler Fitters Local Union No. 669, a national union. In that Agreement, the Company agreed to recognize the Union as the representative of its employees, to comply with the terms and conditions for employees' work set by the Union, and to make monthly payments to the Union's national Health and Welfare, Education, and Pension Funds to cover its future employees' health insurance, retirement, and ongoing training requirements.

The Section 8(f) pre-hire agreement was actually a form agreement the terms of which were predetermined by the National Fire Sprinkler Association (an outside association of

sprinkler installation companies of which the Company was not a member) and the national Union. The Company did not negotiate or have any input concerning the terms of the agreement. Illustrating the cookie-cutter nature of the terms, the first agreement that Stringer signed was in 1991, three years before the Company hired a single sprinkler fitter. Yet that 1991 Agreement included a provision labeled "Acknowledgement of the Representative Status of Road Sprinkler Fitters Local Union No. 669," purportedly certifying that "on the basis of objective and reliable information," the Company had "confirmed that a clear majority of the sprinkler fitters in its employ"—of which it had none—"have designated, are members of, and are represented by [the Union] for purposes of collective bargaining." J.A. 93. The 1991 Agreement went on to have the Company "unconditionally acknowledge[] and confirm[]" that the national Union "is the exclusive bargaining representative of its sprinkler fitter employees pursuant to Section 9(a) of the National Labor Relations Act." J.A. 93.

In 1994, the Company hired its first employees. Over the next two decades, the Company continued to hire employees primarily through the Union's apprenticeship program, and entered into successive multi-year representation Agreements with the Union. The next three Agreements—in 1994, 1997, and 2000—likewise said that the Company acknowledged "the Union's status as the exclusive bargaining representative of its employees pursuant to Section 9(a) of the National Labor Relations Act." J.A. 85; 87; 89.

In 2005, the Company signed its fifth Agreement with the Union, which again was a nationwide form contract. The 2005 Agreement included a similar acknowledgement of representative status, and then added the additional statement "that the Union has offered to provide the Employer with

confirmation of its support by a majority of such employees." J.A. 83. The subsequent two Agreements retained that same language.

In 2010, Stringer told the Union that the Company was in serious financial straits, and that he was concerned that he would be unable to continue meeting the same contractual obligations, especially the payments into the Union's Health and Welfare, Education, and Pension Funds. After some convincing, Stringer chose to renew the Agreement. Stringer's predictions came true, however, and the Company became delinquent on fund payments three months before the contract's expiration in March 2013. Stringer met with the Union several times over the next few months, and eventually reached a settlement agreement under which, in June 2013, the Company paid back the three missed contributions.

At that same time, Stringer and the Union were also attempting to hammer out a new collective bargaining agreement. Stringer told the Union's business agent that he wanted to remain a Union contractor, but could not afford fund payments because of increased competition from non-union sprinkler installation companies. The Union responded that the Company was obligated to honor the existing terms and to negotiate a new contract. After several efforts to reach an agreement failed, Stringer informed the Union in October 2013 that he had gone ahead and offered his employees a non-union health insurance plan. The Union claimed that was a violation of their Agreement because it was the employees' exclusive bargaining representative.

The Union then filed two unfair labor practice charges with the National Labor Relations Board against the Company. The charges alleged that the Company had violated the National Labor Relations Act by (i) "discontinuing

contributions to the [Union's] benefit funds," J.A. 55, and (ii) unilaterally implementing a change in the employees' terms of employment in breach of its obligation to negotiate with the Union in good faith and to preserve the existing employment terms in the interim, all in violation of 29 U.S.C. § 158(a)(1) and (a)(5). The Company in turn contended that the Union's charges were time-barred and that, in any event, it had lawfully implemented its own healthcare plan because its contractual relationship with the Union was governed by Section 8(f), which imposed no duty to continue bargaining once the contract expired.

An administrative law judge concluded that the Company was at fault, reasoning that the 2005 Agreement had converted the Section 8(f) Agreement into one governed by Section 9(a) and its general prohibition against unilaterally altering employment terms during collective bargaining negotiations. The administrative law judge also concluded that the unfair labor practice charges related to the cessation of payments to the Union's benefit funds were time-barred.

The National Labor Relations Board affirmed in part and reversed in part. Pointing to the added language in the 2005 and subsequent Agreements about the Union's offer of proof of its representative status, the Board agreed that the Company's and Union's relationship had become one governed by Section 9(a) because "clear and unequivocal contract language can establish a 9(a) relationship in the construction industry." *Colorado Fire Sprinkler Inc. and Road Sprinkler Fitters Local Union No. 669, U.A., AFL-CIO*, 364 N.L.R.B. No. 55, at 1 (2016) (citing *Staunton Fuel*, 335 N.L.R.B. 717 (2001)). The Board then disagreed with the administrative law judge's timeliness finding, and ordered the Company to bargain with the Union, to make up any outstanding contributions to the benefit funds, and to reimburse

its employees for any expenses they incurred as a result of the missed contributions.

The Company filed a timely petition for review of the Board's decision, and the Board filed a cross-petition for enforcement.

**II**

**A**

Recognizing the Board's substantial expertise in evaluating unfair labor practices, we will affirm the Board's order as long as its factual findings are supported by substantial evidence. *Nova Plumbing*, 330 F.3d at 536. The Board's analysis, however, must be grounded in the complete record and must grapple with evidence that "fairly detracts from the weight of the evidence supporting [its] conclusion." *Reno Hilton Resorts v. NLRB*, 196 F.3d 1275, 1282 (D.C. Cir. 1999) (citation omitted); *see also Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017). We will also reverse a Board decision if the Board "acted arbitrarily or otherwise erred in applying established law to the facts." *Nova Plumbing*, 330 F.3d at 536. Specifically, in reviewing the Board's determination whether a Section 8(f) or 9(a) relationship existed between the parties, "our inquiry is whether the Board's conclusion was reasonable" under existing law. *Allied Mechanical Services*, 668 F.3d at 772 (citation omitted).

All that means that, in reviewing the Board's decision, we will defer to the reasonable, but will not green light the unreasoned.

**B**

**1**

In deciding whether the relationship between the Union and the Company was governed by Section 8(f), 29 U.S.C. § 158(f), or Section 9(a), 29 U.S.C. § 159(a), at the time their agreement expired in 2010, we are guided by settled precedent and labor-law principles.

To start, "a construction-industry contract will be *presumed* to be governed by section 8(f) unless the employer and union clearly intended to create a section 9(a) agreement." *Nova Plumbing*, 330 F.3d at 537 (citing *J&R Tile, Inc.*, 291 N.L.R.B. 1034, 1037 (1988)) (emphasis added). That presumption attached here. When the Union's and Company's relationship first started, it was governed by Section 8(f), and the 1991 Agreement was a pre-hire contract. It could not be otherwise because, at the time the 1991 Agreement was adopted, the Company had no employees at all—there was no one to vote the Union in as labor's representative under Section 9(a).

Given that Section 8(f) starting point, the General Counsel bore the burden of proof to overcome the presumption of continued Section 8(f) status with "clear[]" evidence that *both* the Union and the Company intended to transition to a Section 9(a) relationship. *Nova Plumbing*, 330 F.3d at 537.

Those burdens of proof matter. The *raison d'être* of the National Labor Relations Act's protections for union representation is to vindicate the *employees*' right to engage in collective activity and to empower *employees* to freely choose their own labor representatives. *See International Ladies' Garment Workers' Union v. NLRB*, 366 U.S. 731, 738–739

(1961) ("[T]he premise of the [National Labor Relations] Act * * * [is] to assure freedom of choice and majority rule in employee selection of representatives."); *see also Skyline Distributors v. NLRB*, 99 F.3d 403, 411 (D.C. Cir. 1996) ("One of the principal protections of the [National Labor Relations Act] is the right of employees to bargain collectively through representatives of their own choosing *or* to refrain from such activity."). So under Section 9(a), the rule is that the employees pick the union; the union does not pick the employees.

The unusual Section 8(f) exception is meant not to cede all employee choice to the employer or union, but to provide employees in the inconstant and fluid construction and building industries some opportunity for collective representation. *See Raymond Interior Systems, Inc. v. NLRB*, 812 F.3d 168, 176–177 (D.C. Cir. 2016). A pre-hire arrangement still is ultimately meant to benefit the employees and to promote harmonious labor relations in those industries; it is not meant to force the employees' choices any further than the statutory scheme allows. *See NLRB v. Local Union No. 103*, 434 U.S. 335, 346 (1978) (stating that the "major purpose" of Section 8(f), in conjunction with other statutory provisions, is "to implement one of the [National Labor Relations] Act's principal goals— to ensure the employees were free to make an uncoerced choice of bargaining agent"); *see also Jim McNeff, Inc. v. Todd*, 461 U.S. 260, 268–270 (1983).

Because the statutory objective is to ensure that only unions chosen by a majority of employees enjoy Section 9(a)'s enhanced protections, the Board must faithfully police the presumption of Section 8(f) status and the strict burden of proof to overcome it. Specifically, the Board must demand clear evidence that the employees—not the union and not the employer—have independently chosen to transition away from

a Section 8(f) pre-hire arrangement by affirmatively choosing a union as their Section 9(a) representative.

**2**

This court's decisions in *Nova Plumbing* and *Allied Mechanical* provide two goalposts guiding the analysis of what evidence is required for a union to score a Section 9(a) relationship.

In *Nova Plumbing*, a construction contractor and union entered into a labor agreement. The contract included a "recognition clause" stating that "independently verified" evidence had been presented to the company "demonstrat[ing] that the Union represents an uncoerced majority of the employees * * *." 330 F.3d at 535. Despite that language, the record was devoid of any actual evidence of employee support submitted by the union to Nova Plumbing or to anyone else. Even more damning, "uncontradicted testimony" in the record indicated that senior employees actually opposed union representation. *Id.* at 537.

We held that "contract language" and the "intent" of the union and company alone generally cannot overcome the Section 8(f) presumption, and certainly not when "the record contains strong indications that the parties had only a section 8(f) relationship." *Nova Plumbing*, 330 F.3d at 537. While such language could be a relevant factor, the "proposition that contract language alone can establish the existence of a section 9(a) relationship runs roughshod over the principles" of employee choice "established in" Supreme Court precedent. *Nova Plumbing*, 330 F.3d at 536–537 (citing *Garment Workers' Union*, 366 U.S. at 738–739). In particular, language crafted solely by the union and employer "completely fails to account for employee rights," and creates a risk of the union

and employer "colluding at the expense of employees and rival unions." *Nova Plumbing*, 330 F.3d at 537. For those reasons, an "agreement between an employer and union is void and unenforceable * * * if it purports to recognize a union that actually lacks majority support as the employees' exclusive representative." *Id.*

Conversely, *Allied Mechanical* established that, when there is strong evidence of employee majority support in the record, such as authorization cards signed by employees, then a union's offer to provide concrete evidence of its majority status can convert a Section 8(f) relationship into a Section 9(a) one. 668 F.3d at 768. Whether the employer viewed that evidence is beside the point; what matters is that the affirmative evidence of majority support exists in the record. *Id.*; *see M&M Backhoe Service*, 469 F.3d at 1050–1051 (union had collected authorization cards).

This case falls in the middle. The record is bereft of evidence either confirming or controverting majority support. In the Company's twenty-year history, there were no petitions, authorization cards, or votes confirming or denying the Union's majority status. No anecdotal evidence was offered either. The only evidence the Union points to is the rote language repeated in a series of contracts purporting to acknowledge the Union's status as "the exclusive bargaining representative of its employees pursuant to Section 9(a) of the National Labor Relations Act." J.A. 89; 87; 85; 83; *see also* J.A. 93.

The Board concluded that contract language was enough, invoking past Board precedent holding that a written agreement can "establish a 9(a) relationship if its language unequivocally indicates that the union requested recognition as majority representative, the employer recognized the union as majority

representative, and the employer's recognition was based on the union's having shown, or having offered to show, an evidentiary basis of its majority support." *Staunton Fuel*, 335 N.L.R.B. at 717; *see Colorado Fire Sprinkler Inc.*, 364 N.L.R.B. at 1 n.3 ("Here, it is undisputed that the *Staunton Fuel* requirements are met.").

That approach by the Board will not do. The first two prongs of the *Staunton* test do nothing more than document the union's and employer's views on Section 9(a) status. They say nothing about the pivotal question of employee support for the union. It is the "employees['] freedom of choice and majority rule" that Section 9(a) "guarantees." *Garment Workers' Union*, 366 U.S. at 737. That choice cannot be arrogated by a union or an employer.

As for the third prong, the Board's reliance in this case on a mere offer of evidence in a form contract—the language of which has been proven demonstrably false in at least one prior iteration—would reduce the requirement of affirmative employee support to a word game controlled entirely by the union and employer. Which is precisely what the law forbids. For what *Garment Workers' Union*, *Nova Plumbing*, and *Allied Mechanical* collectively teach is that, while an employer and a union can get together to create a Section 8(f) pre-hire agreement, *only the employees*, through majority choice, can confer Section 9(a) status on a union. So to rebut the presumption of Section 8(f) status, actual evidence that a majority of employees have thrown their support to the union must exist and, in Board proceedings, that evidence must be reflected in the administrative record.

The Board could point to no such evidence here. None of the usual indicia of majority support—authorization cards or votes—was introduced; it apparently does not exist. And the

contract language on which the Board hung its hat defied reality. The very first 1991 Agreement between the Union and the Company recited that the Company had "confirmed that a clear majority of the sprinkler fitters in its employ have designated * * * [the Union] for purposes of collective bargaining," and that the Union was the "exclusive bargaining representative * * * pursuant to Section 9(a) of the National Labor Relations Act." J.A. 93. That contract language was objectively false. There is no dispute that the Company had zero employees at the time it signed onto that contract language.

Nor is there any dispute that every Agreement signed by the Company was a carbon-copy contract proffered by the Union without any input from the Company or its employees. The 1991 Agreement, for example, was sent to Stringer, and "all [he] had to do was sign the agreement." J.A. 26:13. He did not discuss with the Union what the Agreement contained, and there was no negotiation over its terms. Instead, the union-recognition clauses in the Agreements Stringer signed simply bound him to the terms and conditions of the general agreement between the National Fire Sprinkler Association and the national Union. None of its terms were specific to the Company or its employees.

That same pattern continued for each successive Agreement. They were all just mailed to Stringer, who signed them without any "back and forth on the contents." J.A. 27:10–11. The resulting union-recognition clauses were boilerplate. Apparently, they were never fact-checked either.

The Board points to the addition of language in the 2005 Agreement stating that the Union "offered to provide the Employer with confirmation of its support." J.A. 83. But nothing in the record provided the Board any reasonable basis

for finding this cut-and-paste language from the national contract any more accurate than the previous empty representations. Tellingly, at no point in the administrative record did the Union even explain, let alone proffer, what evidence it claimed to have collected. Given the central importance of honoring employees' organizational rights and the risks of employer-union collusion, the Board must identify something more than truth-challenged form language before it can confer exclusive bargaining rights on a union under Section 9(a).

\* \* \* \* \*

By blinking away record evidence undermining the credibility or meaningfulness of the recognition clauses, the Board "entirely failed to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although actual employee support for the Union was the dispositive issue in the case, the record lacks any affirmative evidence—let alone substantial evidence—of the employees' views.

The Board's decision was also arbitrary and capricious. By making demonstrably untrustworthy contractual language the be-all and end-all of Section 9(a) status, the Board adopted a rule of law that would leave in potentially "careless employer and union hands the power to completely frustrate employee realization of \* \* \* freedom of choice and majority rule in employee selection of representatives." *Garment Workers' Union*, 366 U.S. at 738–739.\*

---

\* Because the record does not support the Board's conclusion that the Union was the employees' Section 9(a) representative, we have no need to address the Company's remaining challenges to the

Accordingly, we grant the Company's petition for review, deny the Board's cross-application for enforcement, vacate the Board's decision, and remand.

*So ordered.*

---

timeliness of the Union's unfair labor practice charges or to the remedy imposed by the Board.